RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0138p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

ANDRE WILLIAMS,

*Petitioner-Appellant,*

*v.*

Nos. 03-3626/12-4269

BETTY MITCHELL, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 09-02246—Donald C. Nugent, District Judge;
No. 99-02399—Kathleen McDonald O'Malley, District Judge.

Argued: January 21, 2015

Decided and Filed: July 7, 2015

Before: MOORE, GIBBONS, and ROGERS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Alan C. Rossman, OFFICE OF THE FEDERAL PUBLIC DEFENDER/CAPITAL HABEAS UNIT, Cleveland, Ohio, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Alan C. Rossman, VICKI Ruth Adams Werneke, Jillian S. Davis, OFFICE OF THE FEDERAL PUBLIC DEFENDER/CAPITAL HABEAS UNIT, Cleveland, Ohio, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court in which ROGERS, J., joined, and GIBBONS, J., joined in part. GIBBONS, J. (pp. 24–27), delivered a separate opinion concurring in part and in the judgment.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  An Ohio jury convicted Petitioner-Appellant Andre Williams of aggravated murder and sentenced him to death.  After filing direct appeals and seeking post-conviction relief in state and federal courts, Williams filed a post-conviction petition in Ohio state court pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), arguing that he is ineligible for the death penalty because he is intellectually disabled.  The Ohio courts rejected Williams's *Atkins* petition, and the district court denied Williams's federal habeas petition.  On appeal, Williams argues that his trial counsel provided ineffective assistance at the penalty phase for failing to obtain a mitigation specialist to explain his intellectual limitations to the jury, and he argues that his *Atkins* petition was improperly denied because he is intellectually disabled.  For the following reasons, the state court's application of law with regard to whether Williams is intellectually disabled under *Atkins* was contrary to clearly established Federal law.  Accordingly, we **VACATE** and **REMAND** so that the district court may grant a **CONDITIONAL WRIT OF HABEAS CORPUS** prohibiting Williams's execution unless the State reassesses Williams's *Atkins* petition consistent with this opinion.

## I. BACKGROUND

In 1989, Williams was convicted and sentenced to death for murder.  Williams filed direct appeals to the Ohio Eleventh District Court of Appeals and the Ohio Supreme Court, both of which affirmed imposition of the death penalty.  Williams filed his first petition for post-conviction relief, raising seven claims, but the trial court denied the petition without conducting an evidentiary hearing.  On post-conviction appeal, the appellate court affirmed dismissal of Williams's post-conviction petition, and the Ohio Supreme Court declined to exercise jurisdiction.

In his first federal habeas petition, Williams raised thirty-one claims for relief.  On March 28, 2003, the district court denied Williams's petition.  No. 1:99-cv-2399, R. 45 (D. Ct. Mem. and Order) (Page ID #68).  Relevant here, the court found that Williams's claim that his trial

counsel was ineffective for failing to obtain a mitigation specialist or other mental health professional who could have explained his IQ scores and intellectual functioning to the jury was procedurally defaulted. *Id*. at 82 (Page ID #149). But the court noted that Williams may be entitled to relief pursuant to *Atkins*, which was decided after Williams filed his federal habeas petition and which held that execution of mentally retarded individuals violates the Eighth Amendment's ban on cruel and unusual punishments.[1] *Id*. at 84–85 (Page ID #151–52). The district court declined to issue a certificate of appealability as to any of Williams's claims. *Id*. at 117 (Page ID #184). Williams filed a notice of appeal, and we granted Williams's motion to stay and hold the case in abeyance to allow him to pursue his *Atkins* claim in state court. *See* No. 03-3626, R. 16 (6/27/03 Letter); No. 09-3898, R. 8 (9/28/09 Order).

Williams then filed a post-conviction petition in Trumbull County, Ohio, Court of Common Pleas on June 9, 2003 asserting that his death sentence should be nullified because he is intellectually disabled pursuant to *Atkins* and the Ohio Supreme Court's decision *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002), which set forth Ohio's standards for determining intellectual disability pursuant to *Atkins*. Appendix to Appellant Br. ("Appx.") at A-1 (*Atkins* Petition at 1). In his five-page petition, Williams asserted that the state trial court should find him intellectually disabled based on collateral estoppel on the grounds that the Ohio Supreme Court and this court have already determined him intellectually disabled, or by taking judicial notice of the trial proceedings. *Id*. at A-1–4 (*Atkins* Petition at 1–4). In the alternative, Williams requested an evidentiary hearing and sought leave to conduct discovery and funds for an expert. *Id*. at A-4 (*Atkins* Petition at 4). Williams attached to his petition an affidavit from his cousin, Stacey Vail, who noted Williams's deficiencies in mental capacity and adaptive skills up until his incarceration in 1989 when Williams was twenty-one years old. Appx. at A-6 (Ex. A to *Atkins* Petition).

In response to Williams's petition, the State of Ohio filed a motion to dismiss the petition and/or motion for summary judgment. Appx. at A-14 (State's Mot. to Dismiss and/or SJ). The state attached over 170 pages of exhibits to its motion. *Id*. at A-50–221 (Exs. to State's Mot. to

---

[1]Recent judicial opinions and the professional community have adopted the contemporary term "intellectual disability" rather than "mental retardation." We adopt for our present analysis the term "intellectual disability." But where quoting and discussing previous opinions and reports that employed the term "mental retardation," we will employ the old term for clarity of reference.

Dismiss and/or SJ). In response to the state's motion, Williams filed a "Motion Opposing Judgment" in which he again argued that a hearing was necessary to adjudicate fairly his petition. Appx. at A-241 (Williams Mot. Opp. Judgment). Along with his motion, Williams filed school records and psychological reports, which indicated, among other things, that at the age of fifteen Williams had a full-scale IQ score of 67 and the "social age" of a "nine year old with deficiencies in communication, locomotion, occupation and self-direction," Appx. at A-271–72 (8/31/83 Psychologist Rep. at 2–3), along with his full prison record. Williams also attached a three-page "Preliminary Psychological Evaluation" dated December 9, 2003 from Dr. James Eisenberg, in which Dr. Eisenberg gave his "preliminary opinion" that Williams "d[id] not currently meet the criteria for a diagnosis of mental retardation based on the *Lott* definition" given his full-scale IQ of 75 per the Wechsler Adult Scale of Intelligence. Appx. at A-253–55 (Eisenberg Prelim. Rep. at 1–3).

Based on this record, the state trial court granted the state's motion for summary judgment without a holding an evidentiary hearing, finding Williams failed to present sufficient evidence to meet the three-factor "*Atkins/Lott* test." Appx. at A-284–291 (10/19/04 Tr. Ct. Op. at 6–13). The Ohio Court of Appeals reversed this decision, holding that the trial court impermissibly weighed conflicting evidence, made findings of fact, and relied on "unauthenticated documents submitted by the state that were allegedly handwritten or typed by Williams," and remanded to the trial court. *State v. Williams*, 847 N.E.2d 495, 499–500 (Ohio Ct. App. 2006). On remand, the trial court again granted summary judgment without holding an evidentiary hearing, again finding Williams failed to present sufficient evidence to meet any of the three factors under the *Atkins/Lott* test. Appx. at A-309 (9/11/07 Tr. Ct. Op.). In doing so, the trial court relied largely on the same grounds as in its prior opinion—it gave little weight to or disregarded evidence favoring Williams, while crediting evidence presented by the state. *See id*. at A-322–33 (9/11/07 Tr. Ct. Op. at 14–25).

This time, the Ohio Court of Appeals affirmed the dismissal of Williams's petition, though it did not accept the trial court's reasoning. *State v. Williams*, No. 2007-T-0105, 2008 WL 2582849 (Ohio Ct. App. June 27, 2008). Relying on evidence that the trial court gave little weight or disregarded (*e.g.*, IQ score of 67 and Vail Affidavit, *see* Appx. at A-322–25 (9/11/07

Tr. Ct. Op. at 14–17)), the court held that Williams met his burden under the third *Lott* factor— onset of intellectual disability before the age of eighteen. *Williams*, 2008 WL 2582849, at *5–6. But the appellate court determined that Williams failed to meet the first two *Lott* factors— "(1) significantly subaverage intellectual functioning[] [and] (2) significant limitations in two or more adaptive skills." *Id.* at *5 (quoting *Lott*, 779 N.E.2d at 1014). The court rested on the fact that these two criteria apply only to Williams's "present functioning," and evidence of Williams's intellectual functioning and adaptive skills earlier in his life "do not constitute competent evidence from which inferences may be made regarding his present mental capacity." *Id.* at *6. After rejecting this evidence, the court held that the sole remaining evidence put forth by Williams—the IQ of 75 in Eisenberg's preliminary report—failed to show that Williams is mentally retarded, and so summary judgment for the state was proper. *Id.* The court also held that evidence of the underlying crimes and prison records indicated that Williams did not have current limitations in adaptive skills. *Id.*[2]

The Ohio Supreme Court declined jurisdiction. Appx. at A-352 (Ohio Sup. Ct. Entry). Williams then filed a second federal habeas petition, arguing that he is ineligible for the death penalty because he is mentally retarded under *Atkins*. No. 1:09-cv-2246, R. 6 (Pet. for Writ of Habeas Corpus) (Page ID #177). The federal district court denied Williams's petition under 28 U.S.C. § 2254. No. 1:09-cv-2246, R. 36 (D. Ct. Opinion) (Page ID #741). In doing so, the district court held that "it was not unreasonable" for the state appellate court to exclude the pre-1989 evidence from its analysis of the first two *Lott* factors. *Id.* at 58 (Page ID #798). The district court also denied Williams's request for discovery and an evidentiary hearing. *See* No. 1:09-cv-2246, R. 27 (D. Ct. Opinion) (Page ID #614). This appeal followed.

---

[2]No other member of the three-judge court of appeals panel joined the lead opinion's analysis. Judge Trapp concurred in judgment only and wrote a separate opinion asserting that abuse of discretion is the correct standard of review, rather than the de novo standard applied by the lead opinion's author, Judge Grendell. Judge O'Toole filed a dissenting opinion in which she found that "it is clear that *Atkins*, *Lott*, and *White* and their progeny as well as the U.S. and Ohio constitutions require an evidentiary hearing to determine the issue of [Williams's] retardation." *Williams*, 2008 WL 2582849, at *9. We treat Judge Grendell's lead opinion as operative, given that it is the only opinion offering substantive analysis to support the court of appeals's decision. Because our resolution of this appeal does not turn on the proper standard of review, we do not address this issue.

## II.  STANDARD OF REVIEW

In a federal habeas corpus proceeding, "we review the district court's legal conclusions *de novo* and its factual findings for clear error." *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a writ of habeas corpus may not be granted unless the state court's adjudication of the claim on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court's decision is "contrary to" clearly established Federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  A state court's decision is an "unreasonable application" of clearly established Federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Id.* at 407–08.  Under § 2254(d)(1)'s unreasonable-application clause, the critical point is whether "it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

The phrase "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  But "because *Atkins* reserved for the states the task of developing appropriate ways to enforce the constitutional restriction" prohibiting the execution of the intellectually disabled, "federal courts conducting habeas review routinely look to state law that has been issued after the defendant's state conviction has become final in order to determine how *Atkins* applies to the specific case at hand." *Black v. Bell*, 664 F.3d 81, 92 (6th Cir. 2011) (internal quotation marks omitted).  This means that where a state-court decision is "contrary to" clearly established state supreme court precedent applying *Atkins*, the decision is

"contrary to *Atkins*" for purposes of habeas review. *Id*. at 96–97. Thus, in the *Atkins* context, "clearly established governing law" refers to the Supreme Court decisions and controlling state law decisions applying *Atkins*. *See Van Tran v. Colson*, 764 F.3d 594, 617–19 (6th Cir. 2014) (holding that the Tennessee state court's *Atkins* determination was "contrary to clearly established governing law" as set forth in Tennessee Supreme Court precedent applying *Atkins*). In determining whether to grant a petitioner habeas relief, a federal court must "review the last state court decision adjudicated on the merits." *Gagne v. Booker*, 680 F.3d 493, 511–12 (6th Cir.), *cert. denied*, 133 S. Ct. 481 (2012).

## III. ANALYSIS

On appeal, Williams raises three issues for review. First, Williams argues that his trial counsel was ineffective at the penalty phase for failing to obtain a mitigation specialist to explain his intellectual limitations. Second, Williams claims that the Ohio state court's dismissal of his *Atkins* petition was contrary to and/or an unreasonable application of clearly established Federal law or an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1)–(2). Finally, Williams argues that the federal district court improperly denied discovery and an evidentiary hearing. We address each issue in turn.

**A. Williams's Claim of Ineffective Assistance of Trial Counsel Is Procedurally Defaulted**

We first address Williams's claim that his trial counsel provided constitutionally ineffective assistance at the penalty phase by filing to obtain a mitigation specialist to explain to the jury the significance of his intellectual deficiencies. The district court found this claim procedurally defaulted. We agree.

We review a district court's determination that a claim is procedurally defaulted de novo. *Carter v. Mitchell*, 693 F.3d 555, 563 (6th Cir. 2012). "[A] petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999)). To avoid procedural default, the petitioner must "exhaust" all state-court remedies. *Carter*, 693 F.3d at 563–64. Exhaustion requires "fair presentation" of the federal claim "to the state courts, including the state court of appeals and the

state supreme court." *Bray v. Andrews*, 640 F.3d 731, 734–35 (6th Cir. 2011) (brackets omitted); *see O'Sullivan*, 526 U.S. at 845 ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). To fairly present a federal claim, a state prisoner is required to present the state courts with "both the *legal* and factual basis" for the claim. *Anderson*, 460 F.3d at 806 (emphasis in original). "If a prisoner failed to exhaust his or her state court remedies and state law would no longer permit the petitioner to raise the claim when he or she files a petition for habeas relief in federal court, the claim is procedurally defaulted." *Carter*, 693 F.3d at 564. A petitioner may overcome default by showing "cause" and "prejudice" for failing to exhaust. *Id*.

Williams argues on appeal that his trial counsel was ineffective at the penalty phase for "fail[ing] to obtain a mitigation specialist or other mental health professional who could have explained his borderline mental retardation and learning disabilities to the jury." Appellant Br. at 68. On direct appeal to the Ohio Court of Appeals, Williams fairly presented this claim—in his Thirteenth Assignment of Error, he argued that he was denied effective assistance of counsel at the penalty phase in violation of the United States Constitution because his counsel failed to offer expert testimony to explain the significance of his low IQ scores and mental defects. Supplemental Appendix to Appellee Br. ("Supp. Appx.") at 915–18 (Williams 9/16/91 Ohio Ct. App. Br. at 52–55). But after the Ohio Court of Appeals rejected this argument on the merits, Supp. Appx. at 1032–33 (3/27/95 Ohio Ct. App. Op. at 63–64), Williams failed to raise the claim to the Ohio Supreme Court on direct appeal. *See* Supp. Appx. at 1088 (Williams 6/26/95 Ohio Sup. Ct. Br.).

Williams also failed to present this claim throughout his state post-conviction appeal. In his initial post-conviction petition, Williams argued that he received ineffective assistance of counsel under federal law because, among other things: his counsel failed to investigate his medical history and the reasons for a drop in his IQ from 1978 to 1983, Supp. Appx. at 1198–99 (Williams Post-Conv. Pet. at 29–30); his counsel failed to begin preparing for the penalty phase until after the verdict in the guilt phase of the trial, *id*.; the trial court denied Williams the funds to present an expert to testify about his intellectual capabilities, *id*. at 1199–1203 (Williams Post-

Conv. Pet. at 30–34); and his "trial counsel failed to investigate or raise these matters" in violation of federal law, *id*. at 1209 (Williams Post-Conv. Pet. at 40). In support, Williams attached to his petition affidavits from criminal defense attorneys with experience trying capital murder cases who attested that an expert was necessary to effectively gather mitigating evidence during the penalty phase, and Williams was prejudiced by his counsel's failure to present evidence from a psychologist or psychiatrist at trial. *Id*. at 1240, 1244 (Ex. E to Williams Post-Conv. Pet.; Ex. G to Williams Post-Conv. Pet.); *see also* Supp. Appx. at 1248 (Williams Mem. in Supp. of Mot. for Expert Funds at 1) (asserting in a subsequent motion for funds to hire an expert for post-conviction proceedings that Williams's trial counsel was ineffective under federal law for "fail[ure] to secure a neuropsychologist to determine the effect of head injuries and repeated blackouts on the Petitioner's neurological functioning.").

The post-conviction trial court rejected these claims. In doing so, the court noted that Williams raised the same ineffective-assistance claims on direct appeal in his Thirteenth Assignment of Error. Supp. Appx. at 1271 (Find. of Fact and Concl. of Law). The court further noted that Williams supported his claim of ineffective assistance of counsel through affidavits, one of which argued that Williams's trial counsel was ineffective for failing to obtain an expert to assist in the preparation and presentation of mitigating evidence at the penalty phase of trial. *Id*. at 1272 (Find. of Fact and Concl. of Law). But the court rejected this affidavit as a "statement[] of opinion" rather than a "statement[] of operative 'facts'" and, consequently, found that Williams failed to raise sufficient facts to demonstrate lack of effective counsel and resultant prejudice. *Id*. at 1273 (Find. of Fact and Concl. of Law). Based on this, the claim of ineffective assistance of counsel that Williams asserts here—that his trial counsel was ineffective for failing to present a mitigation expert at the penalty phase—was fairly presented to the state post-conviction trial court.

But then Williams failed to present this claim throughout "the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. In his initial post-conviction appeal, Williams argued that the jury should have heard all mitigation evidence and that his trial counsel was ineffective under federal law for failing to "investigate possible mitigating factors by making a thorough review of the Petitioner's background," citing his history of blackouts and

low IQ scores and his counsel's failure to prepare adequately for the penalty phase of trial as support. Supp. Appx. at 1297–99 (Williams 10/27/97 Ohio Ct. App. Br. at 12–14). The court of appeals rejected his ineffective-assistance claim based on res judicata on the grounds that the affidavits supporting the claim were based on opinion and evidence of Williams's declining IQ was introduced at the penalty phase of trial. Supp. Appx. at 1331–32 (10/19/98 Ohio Ct. App. Op. at 6–7). Then, Williams's post-conviction brief to the Ohio Supreme Court stated flatly, without citation to legal authority: "[t]he petition also alleged that Appellant experienced a 10 point IQ drop in a few short years, that trial counsel did nothing about this potential mitigation evidence except to call a school counselor at trial; that the drop was indicative of the possibility of organic brain damage; and that it was ineffective assistance of counsel to fail to pursue such a matter." *Id*. at 1348 (Williams 11/30/98 Ohio Sup. Ct. Br. at 9) (footnote omitted). The Ohio Supreme Court declined jurisdiction. *State v. Williams*, 706 N.E.2d 788 (Ohio Mar. 3, 1999).

Nowhere does Williams even suggest in his post-conviction appellate filings that his trial counsel was ineffective at the penalty phase for failing to present a mitigation specialist to explain his low IQ scores. Williams's general reference to his trial counsel's failure to "pursue" his intellectual limitations at trial, as asserted in his brief to the Ohio Supreme Court, is not the same as setting forth the factual and legal underpinnings for the claim he advances now—that his trial counsel should have presented expert assistance at the penalty phase to explain his low intellectual functioning to the jury, and that his counsel's failure to do so caused him prejudice under the United States Constitution. Indeed, Williams makes no reference whatsoever in his Ohio Supreme Court briefing to his counsel's ineffectiveness for failing to present an expert at trial. The Ohio Supreme Court was thus unable to assess the facts and the law bearing on his constitutional claim, and, consequently, Williams failed to exhaust the claim.

Nor does Williams show "cause" for his failure to exhaust. *Carter*, 693 F.3d at 564. Williams's sole argument on this score is that under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), his post-conviction counsel's ineffectiveness serves as cause for Williams's failure to raise his claim that his trial counsel was ineffective for failing to present an expert at the penalty phase. In *Martinez*, the Court created an exception to the general rule that ineffective assistance in a

post-conviction proceeding does not establish cause for a procedural default. As the Court explained in *Trevino v. Thaler*, *Martinez* held that procedural default can be excused for cause where:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (emphasis in original) (quoting *Martinez*, 132 S. Ct. at 1318–19, 1320–21). In *Trevino*, the Court modified the fourth element to apply to situations where state law makes it "highly unlikely" that a defendant will have a "meaningful opportunity" to raise ineffective-assistance claims on direct appeal. *Id.* at 1921.

We have held that *Martinez* does not apply in Ohio because Ohio permits ineffective-assistance-of-trial-counsel claims on direct appeal—making the exception inapplicable under the fourth prong of the *Martinez* framework—and have questioned whether *Trevino* applies in Ohio based on that prong. *See Henness v. Bagley*, 766 F.3d 550, 557 (6th Cir. 2014) (mentioning issue) (citing *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 750 (6th Cir. 2013), *cert. denied, McGuire v. Robinson*, 134 S. Ct. 998 (2014)). But we again need not decide the applicability of *Trevino* in Ohio based on the fourth prong because Williams fails to satisfy the third prong of the *Martinez/Trevino* framework—as set forth above, his counsel *did raise* the claim of ineffective assistance of trial counsel that he pursues here at the initial-review post-conviction proceedings, yet failed to raise it on post-conviction appeal through to the Ohio Supreme Court. The *Martinez/Trevino* exception is thus inapplicable because it "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1320; *Wallace v. Sexton*, 570 F. App'x 443, 453 (6th Cir. 2014) (holding "ineffective assistance of [the petitioner's] post-conviction appellate counsel is not cause to excuse the procedural default" under *Martinez*).

As a result, Williams has failed to establish cause for failing to exhaust the claim of ineffective assistance of trial counsel that he pursues here, and because he can no longer raise

this claim in Ohio state court, *see* OHIO REV. CODE § 2953.23(A)(1), it is procedurally defaulted. *Carter*, 693 F.3d at 563–64.

**B.     The Operative Ohio Court Decision Dismissing Williams's *Atkins* Petition Is Contrary to Clearly Established Federal Law**

Williams next claims that the Ohio state court's dismissal of his *Atkins* petition was contrary to and/or an unreasonable application of clearly established Federal law or an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1)–(2).  In *Atkins*, the Supreme Court held that execution of intellectually disabled individuals violates the Eighth Amendment's ban on cruel and unusual punishments.  536 U.S. 304.  In doing so, the Court left to the states "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'"  *Id*. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)).  The Court did, however, cite with approval clinical definitions of intellectual disability from the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").  *See id*. at 308 n.3, 318.  Relevant here, the AAMR's definition stated that:  "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more . . . applicable adaptive skill areas . . . . Mental retardation manifests before age 18."  *Id*. at 308 n.3.

In response to *Atkins*, the Ohio Supreme Court set forth in *State v. Lott* the Ohio standards for determining intellectual disability.  779 N.E.2d 1011, 1014 (Ohio 2002).  Adopting the clinical definitions cited with approval in *Atkins*, the *Lott* court defined mental retardation as: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18."  *Lott*, 779 N.E.2d at 1014.  The *Lott* court did not limit the evidence that a party could submit to establish mental retardation under the three-factor test.  To the contrary, in applying this definition to the facts, the *Lott* court held that an IQ score of 72 (but within the "five-point margin of error on any IQ test score") from 1986 and affidavits from family members and friends regarding "personality problems and behavioral indicators of early-life trauma," which indicated that he is mentally retarded; and IQ scores of 77–81 and 83–91, an IQ score of 87–97 from when the petitioner was in the sixth grade, and an IQ score of 86 from 1984, which indicated that he is

not mentally retarded, created questions of fact as to whether the petitioner met the Ohio definition of mental retardation. *Id*. at 1013–14. The *Lott* court thus determined that twenty-year-old evidence of the petitioner's intellectual capabilities and adaptive skills was relevant to whether the petitioner met the newly created three-part test for intellectual disability in Ohio and remanded the case so that the trial court could resolve the factual dispute. *Id*.

Here, the last state-court decision adjudicated on the merits—the June 27, 2008 Ohio Court of Appeals opinion—assessed whether Williams offered sufficient factual support for his *Atkins* petition under the three *Lott* factors. *Williams*, 2008 WL 2582849, at *5 (quoting *Lott*, 779 N.E.2d at 1014). The Ohio Court of Appeals ruled that Williams satisfied the third *Lott* factor because the evidence indicated that he was intellectually disabled before turning eighteen years of age. In doing so, unlike the trial court, the court of appeals credited Williams's full scale IQ score of 67 from the age of fifteen, school and psychological records, and an affidavit from his cousin as competent evidence of intellectual disability under the third *Lott* factor. *Id*. at *5–6. But the court categorically rejected this evidence in assessing whether Williams satisfied the first two *Lott* factors. The court held that because "the definition of retardation adopted by *Lott* contemplates 'substantial limitations in *present functioning*,'" evidence of Williams's adaptive skills and functioning prior to 1989 "d[id] not constitute competent evidence from which inferences may be made regarding his present mental capacity." *Id*. at *6 (emphasis in original). Essentially, the court of appeals held that, based on *Lott*, it could not consider evidence of Williams's intellectual functioning and adaptive skills from before 1989 as competent evidence of his "present functioning" as a matter of law. Based on this, the court affirmed summary judgment for the state on Williams's *Atkins* petition.[3]

We hold that the court of appeals's decision was contrary to clearly established Federal law for a number of reasons. *First*, the Ohio Court of Appeals's refusal to consider past evidence of intellectual disability in determining whether Williams has significantly subaverage mental functioning and adaptive skills limitations is directly contrary to the clearly established governing law set forth in *Atkins/Lott*. Here, the court of appeals was faced with an evidentiary record materially similar to *Lott*—an almost twenty-year-old IQ score of 67 from when Williams

---

[3]Again, the description of the Ohio Court of Appeals's rationale applies only to Judge Grendell's opinion; Judge Trapp concurred in the judgment only, and Judge O'Toole dissented. *See supra* n.2.

was fifteen years old, evidence of limitations in adaptive skills from school and psychological records, and an affidavit setting forth Williams's intellectual limitations up to his incarceration at the age of twenty-one in 1989 (among others), on the one hand; and a more recent IQ score of 75 from Dr. Eisenberg's preliminary report and fifteen years of prison records, on the other. Yet, notwithstanding the *Lott* court holding that past evidence of intellectual functioning (*e.g.*, past IQ scores, evidence of adaptive limitations from "early-life") was relevant to the three *Atkins* factors, the court of appeals rejected outright any pre-1989 evidence from its analysis of Williams's intellectual functioning and adaptive skills, despite finding this same evidence showed that Williams was intellectually disabled before he turned eighteen. The Ohio Court of Appeals thus refused even to consider—as a matter of law—the exact same type of evidence that created a factual dispute in *Lott*. Had the *Lott* court applied the court of appeals's analysis, it would have found no factual dispute because the only evidence suggesting present intellectual disability was Lott's 1986 IQ score and affidavits from family and friends that presumably depended on observation of Lott's pre-incarceration functioning. 779 N.E.2d at 1013. By rejecting past evidence of intellectual deficiencies wholesale, the Ohio Court of Appeals reached a decision opposite to the clearly established Federal law set forth in *Atkins/Lott*. *See Williams*, 529 U.S. at 405; *see also Van Tran*, 764 F.3d at 617–18 (looking to governing state law in determining that the state court's decision at issue was "contrary to clearly established Federal law" in the *Atkins* context); *Black*, 664 F.3d at 96–97 (holding the Tennessee court's failure to consider evidence supporting a finding of mental retardation "contrary to the latest Tennessee Supreme Court's decision on this subject" and thus "contrary to *Atkins*").

That Williams's low IQ scores date from when he was a minor does not adequately distinguish this case from *Lott*, in which there is no indication of Lott's age in 1986, when his IQ was measured as 72. In support of its decision that evidence of Williams's childhood intellectual disability is not competent evidence for Williams's present intellectual capacity, the Ohio Court of Appeals cited the Florida Supreme Court's report of an expert's testimony regarding developmental delays. That expert testified that "'because mental retardation is lifelong, a child may meet the criteria for the diagnosis because of developmental delays without being mentally retarded. . . . Thus, diagnosis of mental retardation in an adult must be based on present or current intellectual functioning and adaptive skills and information that the condition also existed

in childhood.'" *Williams*, 2008 WL 2582849, at *6 (quoting *Jones v. State*, 966 So.2d 319, 327 (Fla. 2007)). But the expert's testimony focused on limitations in adaptive skills, not IQ scores. *See Jones*, 966 So.2d at 327 (noting that expert's testimony was based on clinical authority stating that in some circumstances young children who show signs of mild mental retardation based on "failure in academic learning tasks" may no longer meet the clinical definition as they mature because they "develop good *adaptive skills* in other domains" through training) (emphasis added). Moreover, contrary to the Ohio Court of Appeals's decision here, the *Jones* court held that the expert properly considered evidence from throughout the appellant's life in assessing his adaptive functioning, reviewing the appellant's records from childhood up until the hearing to determine his current functioning. *Id*. at 327–28. In any event, even when applied to IQ scores, the expert testimony quoted above merely suggests that an IQ score obtained when an individual is a minor may in some circumstances be given *less* weight than an adult IQ score, but not *no* weight. A determination that an individual either suffered from developmental delays or is intellectually disabled excludes the possibility that the individual is neither intellectually disabled nor suffered from developmental delays and thus tends to increase the likelihood (albeit perhaps only somewhat) that the individual is intellectually disabled. Further, the probative force of such evidence depends on whether the low childhood IQ scores are the result of lifelong intellectual disability rather than developmental delays. *Jones* is silent on this question, and there is no basis for the Ohio Court of Appeals to have assumed, as it apparently did, that most low childhood IQ scores (or, to be precise, age-fifteen IQ scores) are the result of developmental delays. The Ohio Court of Appeals's determination that Williams's age-fifteen IQ score was not competent evidence to show present intellectual limitations was thus an unreasonable application of *Lott*.

The Ohio Court of Appeals also cited *State v. White*, 885 N.E.2d 905 (Ohio 2008), and *State v. Lorraine*, No. 2006-T-0100, 2007 WL 4376250 (Ohio Ct. App. Dec. 14, 2007), to support its decision to exclude this evidence from its analysis—but neither case supports its holding. In *White*, the Ohio Supreme Court simply quoted the "present functioning" language in the AAMR's definition of mental retardation (quoted above) from *Atkins* in setting forth the background that led to *Lott*'s definition of intellectual disability. 885 N.E.2d at 907–08. Nowhere did it suggest that the "present functioning" language controlled or in any way limited

the evidence that could be presented to support the first two *Lott* factors. To the contrary, the *White* court recognized that intellectual disability must "manifest before age 18" and credited evidence establishing that "a person's mental-retardation status does not change over his lifetime." *Id*. at 908, 917. For these reasons, the *White* court held that the trial court abused its discretion in denying the petitioner's *Atkins* petition because "if an adult is found to have intellectual and adaptive deficits not caused by a brain injury or illness, *it can be inferred* that those deficits have existed since childhood." *Id*. (emphasis added). The *White* court thus recognized that because intellectual disability manifests itself during childhood and remains static throughout life, evidence of intellectual disability from one point in life is relevant to an examination of intellectual disability in another. That developmental delays may account for some low IQ scores in juveniles does not automatically eliminate the relevance of juvenile IQ scores to a determination of adult intellectual capacity.

Similarly, *Lorraine* expressly rejected the Ohio Court of Appeals's reading of "present functioning" in this case—it explained that "[t]he trial court *should not* have couched the inquiry in terms of 'present mental status,'" yet it recognized that "the question of a relevant 'time-frame[]' is 'more seman[t]ical than real . . . [s]ince mental retardation is a developmental disability that becomes apparent before adulthood." 2007 WL 4376250, at *4 (emphasis added) (internal quotation marks omitted). Indeed, the court explained, any "reference to appellant's 'present status' and 'present condition of mental retardation' is actually a misnomer . . . [because] manifestation of mental retardation must occur before age eighteen." *Id*. The court then affirmed the trial court's decision to unseal the appellant's prison mental-health records because the trial court "*d[id] not restrict* its review solely to a consideration of appellant's present mental state." *Id*. (emphasis added); *see also id*. at *6 ("In the interest of fairness to both the State and the offender, an examination of the offender's past and present mental status would serve the interest of justice.") (internal quotation marks omitted).

So, far from supporting the Ohio Court of Appeals's opinion, these cases further establish that the court's wholesale exclusion of past evidence of intellectual disability from its *Atkins* analysis was contrary to clearly established Federal law. *See Van Tran*, 764 F.3d at 617; *Black*, 664 F.3d at 96–97.

*Second*, the Ohio Court of Appeals's ruling is contrary to the established definition of intellectual disability as set forth in clearly established Supreme Court precedent. As expressed in *Atkins*, "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." 536 U.S. at 318. More precisely, the AAMR definition in *Atkins* made clear: "Mental Retardation manifests before 18." *Id*. at 308 n.3. Importantly, the clinical definitions cited with approval by *Atkins* and adopted by *Lott* do not treat present functioning and early onset as unrelated parts of a disconnected three-part test. To the contrary, a plain reading of these clinical definitions makes clear that if an individual is indeed *presently intellectually disabled*, as the term is understood, the disability would have manifested itself *before the individual turned eighteen*. Thus, pursuant to the clinical definitions in *Atkins*, past evidence of intellectual disability—including evidence of intellectual disability from an individual's childhood—is relevant to an analysis of an individual's present intellectual functioning. *See Hall v. Florida*, 134 S. Ct. 1986, 1999 (2014) (rejecting Florida's *Atkins* test where it "[ran] counter to the clinical definition cited throughout *Atkins*").

This is consistent with the Supreme Court's holding in *Heller v. Doe by Doe*, 509 U.S. 312 (1993). In *Heller*, the Court examined the constitutionality of a statute governing the involuntary civil commitment of the mentally retarded. Relying on clinical definitions of mental retardation from the AAMR and others, the Court held that committing the mentally retarded based on clear and convincing evidence of future dangerousness was constitutional because these definitions indicated that intellectual disability "becomes apparent before adulthood" and "is a *permanent, relatively static condition*, so a determination of dangerousness may be made with some accuracy based on previous behavior." *Id*. at 321–23 (emphasis added) (citations omitted). This was particularly true for adults because "[b]y the time the person reaches 18 years of age the documentation and other evidence of the condition have been accumulated for years." *Id*. at 322. Thus, "almost by definition in the case of the retarded [adult] there is an 18-year record upon which to rely" when assessing the individual's *future intellectual functioning*. *Id*. at 323.[4]

---

[4]Indeed, based on the clinical definitions adopted by *Heller*, courts have overwhelmingly held that intellectual capabilities remain stable throughout life and, consequently, evidence of intellectual disability from earlier in life is directly relevant to present-day intellectual disability determinations. *See Talavera v. Astrue*,

The Supreme Court's recent decision in *Hall v. Florida* also applied medical and clinical definitions of intellectual disability—definitions inconsistent with the Ohio Court of Appeals's decision here—in holding Florida's post-*Atkins* test unconstitutional. The Court in *Hall* addressed "how intellectual disability must be defined" in order to implement *Atkins*. 134 S. Ct. at 1993; *see Van Tran*, 764 F.3d at 612 ("[*Hall*] clarified the minimum *Atkins* standard under the U.S. Constitution"). As in *Atkins* and *Heller*, the Court in *Hall* recognized that, "[i]n determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions." *Hall*, 134 S. Ct. 1993; *see Van Tran*, 764 F.3d at 612 ("In *Hall*, the Court reasoned that the Constitution requires the courts and legislatures to follow clinical practices in defining intellectual disability."). Based on these clinical definitions, the Court in *Hall* held that the Florida post-*Atkins* test was unconstitutional because it failed to take into account an IQ test's five-point Standard Error of Measurement ("SEM") and it set a strict IQ cutoff of 70, both of which were contrary to "unanimous professional consensus" and "counter to the clinical definition cited throughout *Atkins*." 134 S. Ct. at 1999–2000. The Court also recognized that, "[f]or professionals to diagnose—and for the law then to determine—whether an intellectual disability exists," courts must analyze all factors bearing on the individual's functioning, such as "past performance, environment, and upbringing." *Id*. at 1996. Indeed, the Court rejected Florida's post-*Atkins* test because, under certain circumstances, its scheme did not permit consideration of "substantial and weighty evidence" the medical community accepts as "probative of intellectual disability," like "medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances." *Id*. at 1994; *see id*. at 2001 (holding that Florida's post-*Atkins* test failed because the petitioner must be able to present

---

697 F.3d 145, 152 (2d Cir. 2012) ("We agree with the majority of our sister Circuits that it is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a fairly constant IQ throughout their lives.") (internal quotation marks and brackets omitted); *Ochoa v. Workman*, 669 F.3d 1130, 1137-38 (10th Cir.), *cert. denied*, 133 S. Ct. 321 (2012) (citing *Heller* for the proposition that because mental retardation is a static condition, any "temporal focus is more semantical than real") (internal quotation marks omitted); *Moormann v. Schriro*, 672 F.3d 644, 649 (9th Cir.), *cert. denied*, 132 S. Ct. 1656 (2012) ("The law . . . does not indicate retardation is a product of changing circumstances."); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages. . . . Rather, a person's IQ is presumed to remain stable over time."); *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001) ("IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life."); *United States v. Smith*, 790 F. Supp. 2d 482, 503–04 (E.D. La. 2011) ("[T]he AAMR/AAIDD has been clear that a person's current strengths and weaknesses are not the best evidence of the relevant facts in an *Atkins* hearing" because IQ "is a relatively stable, immutable trait.").

evidence regarding "deficits in adaptive functioning *over his lifetime*") (emphasis added)[5]; *see also Brumfield v. Cain*, --- S. Ct. ----, No. 13-1433, 2015 WL 2473376, at *9 (June 18, 2015) ("low birth weight," placement in special education classes at an "early age," and "commitment to mental health facilities at a young age," among other evidence, "provided substantial grounds to question [the petitioner's] adaptive functioning").

The Ohio Court of Appeals here categorically excluded this "substantial and weighty evidence" from its analysis. It also ignored the medical community's determination, as adopted by the Supreme Court, that intellectual disability manifests itself before eighteen and remains consistent throughout a person's life. Consequently, the Ohio Court of Appeals's treatment of intellectual disability as evolving—such that Williams's intellectual disability pre-eighteen has no bearing on his current intellectual functioning—relies on a fundamental misunderstanding of governing law. In fact, consistent with these clinical authorities and governing law, the State Attorney General's Office argued repeatedly at oral argument before us in this case that intellectual disability *does not* change over a person's life. The State's point was that Williams's more recent IQ score of 75 is thus determinative. While that may ultimately be the case when the evidence is weighed (an issue we do not decide here), the State's position ignores the fact that, because intellectual functioning does not generally change throughout a person's life, past evidence of intellectual disability (as the Ohio Court of Appeals found in this case) is also relevant to an analysis of present functioning.

This is particularly important because "[i]ntellectual disability is a condition, not a number. Courts must recognize, as does the medical community, that the IQ test is imprecise." *Hall*, 134 S. Ct. at 2001 (citation omitted). Because of this, courts must consider all evidence bearing on an individual's intellectual functioning in determining whether an intellectual disability exists—both past and present. Indeed, the Ohio Court of Appeals's exclusion of this evidence was especially troubling here because the only post-1989 evidence of Williams's intellectual functioning—the preliminary IQ score of 75 from Dr. Eisenberg—placed Williams, at worst, on the borderline of being intellectually disabled. *See Atkins*, 536 U.S. at 309 n.5 ("[A]n IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the

---

[5]Notably, the Court's analysis regarding the relevance of past evidence of intellectual disability was relevant only to the first two *Atkins* factors because the "age of onset" factor was "not at issue" in *Hall*. *Id*. at 1994.

intellectual function prong of the mental retardation definition."); *Hall*, 134 S. Ct. at 1995, 2001 ("[A]n individual's [IQ] score is best understood as a range of scores on either side of the recorded score," and courts must consider the five-point SEM margin of error.); *Brumfield*, --- S. Ct. at ----, 2015 WL 2473376, at *7 ("Accounting for this margin of error, [the petitioner's] reported IQ test result of 75 was squarely in the range of potential intellectual disability."). Of course, how the fact-finder eventually weighs the evidence is beside the point. But weight of the evidence was not the issue here—the Ohio Court of Appeals credited this pre-1989 evidence for purposes of the early-onset factor, but then improperly found the evidence not "competent" as a matter of law for determining present intellectual functioning.**[6]** The court should have recognized instead that the same evidence indicating that Williams was intellectually disabled in childhood is directly relevant to whether Williams is intellectually disabled today under the first two *Lott* factors.

Based on the above authorities, the Ohio Court of Appeals's holding that pre-1989 manifestations of intellectual disability have no bearing on an individual's "present functioning" is "substantially different from the relevant precedent of th[e] Court" and "applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405. As a result, the court's categorical exclusion of the relevant evidence was contrary to clearly established Federal law.

*Finally*, the Ohio Court of Appeals's decision was contrary to clearly established Federal law because it applied an arbitrary and disproportionate evidentiary rule to exclude the pre-1989 evidence at issue. The Supreme Court has clearly established that evidentiary rulings abridge a defendant's due-process right to present evidence when a state court's exclusion of evidence is "arbitrary or disproportionate to the purposes [it is] designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (internal quotation marks omitted); *Holmes v. S. Carolina*, 547 U.S. 319, 326 (2006) ("[T]he Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to

---

**[6]**The State suggested at oral argument before us that the Ohio Court of Appeals did not categorically exclude the evidence, but instead, the court rejected the evidence because it was not properly presented. But nowhere did the court suggest that the evidence was improperly presented; again, to the contrary, it *credited* the pre-1989 evidence in finding that Williams satisfied the third *Lott* factor. The court clearly excluded the evidence from "prior to 1989" because the court held this evidence "d[id] not constitute competent evidence from which inferences may be made regarding [Williams's] present mental capacity." *Williams*, 2008 WL 2582849, at *6.

promote."). The Court has defined "arbitrary" evidentiary rules as rules that exclude important evidence "but that d[o] not serve any legitimate interests." *Holmes*, 547 U.S. at 325. "[T]he exclusion of evidence [is] unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308; *Holmes*, 547 U.S. at 324–25; *see also Loza v. Mitchell*, 766 F.3d 466, 485 (6th Cir. 2014) ("The 'clearly established Federal law,' § 2254(d)(1), at issue is that a defendant's right to present a complete defense is violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the purposes it is designed to serve.") (internal quotation marks omitted).[7]

Here, the Ohio Court of Appeals's decision to exclude categorically pre-1989 evidence of Williams's intellectual disability was arbitrary and disproportionate. The Ohio Court of Appeals's "mechanistic, per se rule" rejected evidence from "prior to 1989" offered by Williams as not "competent evidence" of "present mental capacity" under the first two *Lott* factors. But the court appears to have credited Williams's prison records—which span fifteen years—along with evidence of the underlying crimes—which occurred in 1988—as "considerable evidence" of Williams's "current" limitations in adaptive skills. How the latter evidence (*i.e.*, prison records, the underlying crimes) was "current" when the trial court analyzed the evidence in 2004 and the Ohio Court of Appeals affirmed in 2008 is unclear. Moreover, the court failed to explain why 1989 was the magical line between past and present functioning. Williams was a twenty-one-year-old adult in 1989, so the court's distinction was not between juvenile and adult records (though, for the reasons noted above, categorically excluding the evidence for this reason would have been improper, too). Instead, the court's pre-1989 cutoff appears unmoored to reason or principle—despite purporting to exclude all "past" evidence from its analysis of the first two *Lott* factors, essentially, the court applied its categorical exclusion only to evidence submitted by Williams. The court's per se exclusionary rule was thus unconstitutionally arbitrary and

---

[7]Although these principles are generally applied to a criminal defendant's ability to present a defense during a criminal trial, they apply with equal force in the *Atkins* context. In *Atkins*, the Court held that intellectual disabilities diminish an individual's "personal culpability" and, as a result, people with intellectual disability must be "categorically excluded from execution." *Atkins*, 536 U.S. at 319. It would be anomalous to hold that these due-process principles of fundamental fairness do not apply to evidentiary determinations in proceedings to determine whether the death penalty should be imposed. *See Hall*, 134 S. Ct. at 2001 ("The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution.").

disproportionate. And, of course, the decision infringed upon a weighty interest: the court's decision to exclude this important evidence indicating that Williams was intellectually disabled before age eighteen (a finding that the parties agree would normally hold static throughout Williams's lifetime) was directly relevant to the obviously extremely important issue of whether Williams should live or die based on his intellectual functioning. Thus, for this reason too, the court's blanket exclusion of the evidence was contrary to clearly established Federal law.

**C. Remand**

Finally, Williams argues that because the state court wrongly found that he failed to demonstrate a prima facie case of intellectual disability, the federal district court should have granted Williams discovery and held an evidentiary hearing. But we need not reach that issue here. The Ohio Court of Appeals's decision was contrary to clearly established Federal law under § 2254(d) for improperly excluding evidence relevant to Williams's *Atkins* claim. As set forth above, the Ohio Court of Appeals rejected relevant facts that were necessary to rule on Williams's *Atkins* claim; and it did so based on a misreading of United States Supreme Court jurisprudence and the Ohio Supreme Court's implementing decisions in *Lott* and *White*. Because of this error, the operative state-court decision did not definitively resolve the merits of Williams's *Atkins* claim under a correct reading of the facts and law. We thus do not reach the merits of Williams's *Atkins* claim. *See Black*, 664 F.3d at 101 ("[W]e will refrain from reaching any independent conclusions ourselves because no court has yet analyzed Black's *Atkins* claim according to the proper legal standard.").

Instead, the proper course is to grant a writ of habeas corpus prohibiting imposition of the death penalty, conditioned upon a fresh analysis by the Ohio courts as to whether Williams is intellectually disabled pursuant to governing law. Indeed, this is the course we took in *Van Tran*, where the state court decision "did not apply the proper legal standard and was therefore contrary to clearly established governing law" because it improperly disregarded relevant evidence in its analysis. *Van Tran*, 764 F.3d at 619–20 ("When a constitutional error may be cured by further state proceedings, the common course is to grant the writ of habeas corpus conditional upon the state court's correcting the error."); *see Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006)

("[C]onditional grants [of habeas writs] . . . provide states with an opportunity to cure their constitutional errors, out of a proper concern for comity among the co-equal sovereigns.").

In remanding, we note that clearly established Federal law, as set forth above, requires courts to consider all relevant evidence bearing on an individual's intellectual functioning and to apply clinical principles of intellectual disability adopted by federal precedent. *See, e.g., Hall*, 134 S. Ct. at 2001 (remanding so petitioner could present evidence of his intellectual deficits "over his lifetime"); *Heller*, 509 U.S. at 323 (recognizing that an intellectual disability "is a permanent, relatively static condition"). Indeed, the most recent evidence in the record is well over ten years old, so this could include presentation of new evidence from both Williams and the State relevant to Williams's functioning. *See Hall*, 134 S. Ct. at 2001 ("Intellectual disability is a condition, not a number. Courts must recognize, as does the medical community, that the IQ test is imprecise.") (citation omitted). But whether to grant an evidentiary hearing after considering all relevant evidence and applying the applicable law is for the state court to decide in the first instance. *See* OHIO REV. CODE § 2953.21(E) ("Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues."); *see also Brumfield*, --- S. Ct. at ----, 2015 WL 2473376, at *10 (holding state court erred by failing to hold evidentiary hearing before adjudicating *Atkins* petition based, in part, on evidence of intellectual disability from the petitioner's childhood).

## IV. CONCLUSION

For the foregoing reasons, Williams is not entitled to relief on his claim of ineffective assistance of counsel. But the Ohio state court's application of law with regard to whether Williams is intellectually disabled under *Atkins* was contrary to clearly established Federal law. Accordingly, we **VACATE** and **REMAND** so that the district court may grant a **CONDITIONAL WRIT OF HABEAS CORPUS** prohibiting Williams's execution unless the State reassesses Williams's *Atkins* petition consistent with this opinion.[8]

---

[8]We leave it to the district court to impose any necessary procedures and time limits for conducting this reassessment.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring. I agree that our precedents compel reversal for the reasons explained in the majority opinion and concur in all of it except the two paragraphs concluding that the Ohio Court of Appeals decision was contrary to clearly established Federal law because it applied an arbitrary and disproportionate evidentiary ruling to exclude the pre-1989 evidence at issue. I elaborate slightly on the analysis that provides for me the most obvious and straightforward basis for resolution of this appeal.[1]

AEDPA's limited grounds for relief include a state court's decision on the merits that unreasonably applied clearly established Federal law. 28 U.S.C. § 2254(d). A state court unreasonably applies the law if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

Here, no fairminded jurist could disagree that the Ohio Court of Appeals violated the clearly established law set out in *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Hall v. Florida*, 134 S. Ct. 1986 (2014). Under this theory—unlike the theory upon which the majority opinion principally relies—we need not decide whether the state faithfully applied its own precedent, *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002), in this instance. Instead, we proceed to the heart of the issue and ask simply whether the state court decision involved an unreasonable application of the clearly established law that the Supreme Court announced in *Atkins* and *Hall*.

The clearly established mandate of those cases, for present purposes, is twofold. First, states may take different routes but must reach the same end point: ensuring that no intellectually disabled individual is subjected to the state's death penalty. *Atkins*, 536 U.S. at 317; *Hall*, 134 S. Ct. at 2001 ("The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects."). Second, in deciding which individuals are intellectually disabled, states do not operate in a vacuum. Their tests must be tethered to the

---

[1]Discussion of this issue is found at pp. 17–20 of the majority opinion.

definition of intellectual disability that the Supreme Court has recognized, a definition that is itself heavily influenced by the medical understanding of that condition.  *Hall*, 134 S. Ct. at 2000 ("The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework.  *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals."); *Kansas v. Crane*, 534 U.S. 407, 413 (2002) ("[T]he science of psychiatry . . . informs but does not control ultimate legal determinations . . . .").

The Court applied this standard in *Hall* in holding that Florida's scheme for assessing intellectual disability was incompatible with *Atkins*.  Florida courts imposed a rigid rule requiring a defendant to demonstrate an IQ of seventy or below as a threshold matter.  *Id.* at 1992.  Without such a showing, a defendant would be unable to prove intellectual disability, no matter the other circumstances.  *See id.*  Of the two IQ tests that were admissible in Hall's trial, neither showed an IQ of seventy or below.  *Id.*  The Florida Supreme Court therefore concluded that he was unable to demonstrate intellectual disability, and that the Eighth and Fourteenth Amendments did not bar his execution.  *Id.*  Drawing on the medical understanding of intellectual disability set forth in *Atkins*, the U.S. Supreme Court reversed.  *Id.* at 2001.  It emphasized that IQ test scores are mere "approximations of conceptual functioning," subject to a standard error of measurement.  *Id.* at 2000 (internal quotation marks omitted).  As a result, "an individual with an IQ test score 'between 70 and 75 or lower' . . . may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning."  *Id.* at 2000 (quoting *Atkins*, 536 U.S. at 309 n.5).  Florida's test "contradict[ed] the [IQ] test's own design," by failing to account for the standard error of measurement and eliminating "an essential part of a sentencing court's inquiry into adaptive functioning."  *Id.* at 2001.  The state law therefore contradicted "the unanimous professional consensus."  *Id.* at 2000 (internal quotation marks omitted).

No fairminded jurist could disagree that the Ohio Court of Appeals went similarly awry in *Williams*.  The U.S. Supreme Court, adopting the consensus of the medical community, understands intellectual disability as a permanent condition, affecting a defendant not only at the time of the offense, but also at the times of trial and execution.  *Atkins*, 536 U.S. at 319–21; *see*

*also Heller v. Doe*, 509 U.S. 312, 323 (1993) (noting, in a different context, that intellectual disability "is a permanent, relatively static condition" (citing S. Brakel et al., The Mentally Disabled and the Law 37 (3d ed. 1985))). This is why intellectual disability makes an individual permanently ineligible for execution, unlike an individual deemed incompetent for execution, who may later regain competency and be executed. *See, e.g., Singleton v. Norris*, 319 F.3d 1018, 1027 (8th Cir. 2003) (en banc) (citing *Ford v. Wainwright*, 477 U.S. 399 (1986)). The *Atkins* Court further noted that intellectual disability "'may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system,'" *Atkins*, 536 U.S. at 308 n.3 (quoting Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)), and discussed the deficiencies in cognitive and adaptive functioning that characterize an intellectually disabled person, *id.* at 308 n.4, 309 n.5.[2] It is clear from the entire thrust of the *Atkins* decision—along with the medical literature that it cites in support—that intellectual disability is a permanent condition.

The Ohio Court of Appeals—by contrast—approached the evidence of Williams's alleged intellectual disability as if it were a transient condition. That court held that pre-1989 evidence of Williams's subaverage intellectual functioning and deficits in adaptive functioning "only attest his intellectual functioning prior to 1989" and therefore "do not constitute competent evidence from which inferences may be made regarding his present mental capacity." *State v. Williams*, No. 2007-T-0105, 2008 WL 2582849, at *6 (Ohio Ct. App. June 27, 2008).[3] Given the enduring nature of intellectual disability, there is no basis for excluding evidence from earlier in Williams's life. If Williams was intellectually disabled in 1989, he remains intellectually disabled now. By excluding the pre-1989 evidence, the state court severely limited its own ability to make a reasoned assessment of Williams's condition according to the legal and medical standard that *Atkins* and *Hall* plainly require. Andre Williams "may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability." *See Hall*, 134 S. Ct. at 2001. That includes the evidence that the state court excluded here.

---

[2]The *Atkins* decision and the material it cites refer to the condition as "mental retardation." In modern lexicon, the preferred term is "intellectual disability." *See Hall*, 134 S. Ct. at 1990.

[3]Williams turned 22 in 1989. *See Williams*, 2008 WL 2582849, at *2.

Regardless of whether the Ohio Court of Appeals followed its own state's law, no fairminded jurist could disagree that its decision conflicts with the clearly established law enunciated in *Atkins* and *Hall*. This provides an alternative basis for relief under AEDPA.

I also touch briefly on my quibble with the portion of the majority opinion in which I do not concur. This third rationale is not necessary and I question whether it is appropriate here. The Ohio Court of Appeals did not explicitly invoke any evidentiary rule when it excluded the pre-1989 evidence. The court stated that that evidence was not "competent" to prove present intellectual deficits. In the context of the opinion, this appears to mean that the pre-1999 evidence is not relevant to the *Atkins*/*Lott* test (other than the "onset before 18" prong).

This evidentiary ruling was not arbitrary or disproportionate. The state court excluded the evidence simply because it misunderstood and misapplied *Atkins* and *Lott*. If it had been correct that intellectual disability can fluctuate and that present functioning was a separate fact to be proven, it would have been correct to exclude the pre-1989 evidence as irrelevant. In reality, the court's erroneous exclusion of the evidence was due to a misapplication of the substantive law (an issue the opinion already analyzes), not an arbitrary or disproportionate evidentiary ruling.